## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

SHARON PHILLIPS,                     :
                                     :
              Plaintiff,             :
                                     :     CIVIL CASE NO.
       v.                            :     1:14-cv-00680-TWT-RGV
                                     :
CITY OF ATLANTA, *et al.*,           :
                                     :
              Defendants.            :

## MAGISTRATE JUDGE'S FINAL REPORT AND RECOMMENDATION

Plaintiff Sharon Phillips ("Phillips") brings this employment discrimination action against the City of Atlanta ("the City"), alleging retaliation in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000e, et seq. See [Doc. 16].[1]  Phillips also asserts a state law claim of intentional infliction of emotional distress against Erwin Grant ("Grant"), Joe Johnson ("Johnson"), and Clementine Norton ("Norton"),[2] in their individual capacities.  [Id.].  Defendants have moved for summary judgment as to all of Phillips' claims, [Doc. 117], which

---

[1] The listed document and page numbers in citations to the record refer to the document and page numbers shown on the Adobe file reader linked to the Court's electronic filing database, CM/ECF, with the exception of deposition transcripts, which are also cited according to the transcript page numbers.

[2] The City, Grant, Johnson, and Norton are collectively referred to as "defendants."

Phillips opposes, [Doc. 135].  For the reasons that follow, it is **RECOMMENDED** that defendants' summary judgment motion, [Doc. 117], be **GRANTED**.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

### A.     Preliminary Procedural Issues

"In this District, the process for separating disputed from undisputed material facts is governed by Local Rule 56.1(B)." Brandon v. Lockheed Martin Aeronautical Sys., 393 F. Supp. 2d 1341, 1347 (N.D. Ga. 2005), adopted at 1346.  Compliance with Local Rule 56.1 is the "only permissible way . . . to establish a genuine issue of material fact" in response to the moving party's assertion of undisputed facts. Reese v. Herbert, 527 F.3d 1253, 1268 (11th Cir. 2008).  "The proper course in applying Local Rule 56.1 at the summary judgment stage is for a district court to disregard or ignore evidence relied on by the respondent—but not cited in [her] response to the movant's statement of undisputed facts—that yields facts contrary to those listed in the movant's statement." Id.  The Court must then review the movant's statement of undisputed facts and ensure – by, "[a]t the least, . . . review[ing] all of the evidentiary materials submitted in support of the motion for summary judgment" – that the movant's statement of facts is in fact supported. Id. at 1269 (citation and internal marks omitted).

In compliance with Local Rule 56.1B(1), defendants, as movants, filed a statement of undisputed material facts in support of their motion for summary judgment, [Doc. 117-1], to which Phillips has responded, [Doc. 136].[3] Phillips has also submitted her own "counter-statement of undisputed material facts in opposition to defendants' motion for summary judgment," [Doc. 134 (all caps omitted)], to which defendants have responded, [Doc. 139-1].[4] The Court therefore

---

[3] Local Rule 56.1B(2) requires the non-moving party to include with the responsive brief "[a] response to the movant's statement of undisputed facts[] . . . [that] contain[s] individually numbered, concise, nonargumentative responses corresponding to each of the movant's numbered undisputed material facts." LR 56.1B(2)a(1), NDGa.; see also Williams v. Slack, 438 F. App'x 848, 849 (11th Cir. 2011) (per curiam) (unpublished) (citation omitted); Linao v. GCR Tire Ctrs., Civil Action No. 2:09-CV-134-RWS, 2010 WL 4683508, at *2 (N.D. Ga. Nov. 12, 2010). If the non-moving party fails to respond to a material fact contained in the moving party's statement by directly refuting the fact with concise responses supported by specific citations to evidence, stating a valid objection to the admissibility of the fact, pointing out that the movant's citation does not support the movant's fact, or showing that the movant's fact is not material, the fact will be deemed admitted. See LR 56.1B(2)a(2), NDGa.; BMU, Inc. v. Cumulus Media, Inc., 366 F. App'x 47, 49 (11th Cir. 2010) (per curiam) (unpublished). The Court notes that most of Phillips' responses to defendants' statement of facts fail to comply with the Local Rules. See generally [Doc. 136].

[4] Pursuant to Local Rule 56.1B(2)b, Phillips was required to include with her responsive brief a "statement of additional facts which [she] contends are material and present a genuine issue for trial." LR 56.1 B(2)b, NDGa. Phillips' "counter-statement of undisputed material facts," [Doc. 134 (all caps omitted)], does not comply with this rule since, as she asserts, these facts are undisputed and therefore do not create any genuine issues for trial. Nevertheless, the Court will consider the parties' statements of fact and review the evidentiary material to ensure that the undisputed facts are supported by the record.

accepts as undisputed those facts which the parties admit or have failed to properly dispute or deny.  See [Doc. 136, admitting or failing to properly dispute ¶¶ 1-25, 27-30, 32, 34, 42-45, 47-53, 55-61, 63-64, 66, 68-69, and parts of ¶¶ 26, 31, 33, 35-41, 46, 54, 62, 65, and 67 of defendants' statement, Doc. 117-1; Doc. 139-1, admitting or failing to properly dispute ¶¶ 1-4, 10-13, 15, 21, 25-26, 51-52, 54, 56, 58, 61-63, 72, 81, 88-90, 92-96, 98-110, 112-21, 123, 125-31, 133-36, 138-43, 145-54, 156-72, 174-84, 188-90, 192-96, 198-200, 202-04, 206-10, 212-13, 215-17, 219, 222-23, 225-28, 230-31, 237-38, 242-43, 245-47, 251, 254, 258, 261, 263-73, 276-77, and parts of ¶¶ 6, 8-9, 14, 16-19, 22-24, 27-28, 30-33, 37, 44-45, 47-50, 55, 57, 60, 64-65, 73, 78, 80, 82-83, 85, 87, 111, 122, 124, 132, 137, 144, 173, 185-86, 197, 201, 205, 211, 214, 218, 220-21, 229, 241, and 244 of Phillips' statement, Doc. 134].  The Court, however, has omitted certain facts which are not material to the issues presented in the pending motion for summary judgment, were stated as an issue or legal conclusion, or were not supported by citations to evidence. See LR 56.1B(1), (2)a(2), NDGa.

Defendants also object to certain statements of material facts set forth by Phillips as inadmissible hearsay, among other objections.  See [Doc. 139-1 at 6 ¶ 29, 6-7 ¶ 34, 7 ¶¶ 35-36, 38, 8 ¶¶ 39-42, 8-9 ¶ 43, 9 ¶ 46, 10 ¶ 53, 11 ¶ 59, 13-14 ¶¶ 66-71, 15-16 ¶¶ 74-75, 77, 79, 17 ¶ 91, 32 ¶ 187, 37 ¶¶ 232-33, 38 ¶¶ 234-36, 40 ¶¶ 248-50, 252, 41 ¶¶ 253, 255-57, 42 ¶¶ 259-60, 262].  While the general rule is that

"'inadmissible hearsay cannot be considered on a motion for summary judgment,'"
a court may "'consider a hearsay statement in passing on a motion for summary
judgment if the statement could be reduced to admissible evidence at trial or
reduced to admissible form.'" Sklar v. Clough, Civil Action No. 1:06-CV-0627-JOF,
2007 WL 2049698, at *2 (N.D. Ga. July 6, 2007) (quoting Macuba v. Deboer, 193 F.3d
1316, 1322-23 (11th Cir. 1999)); see also Lentz v. Hospitality Staffing Solutions, LLC,
No. 1:06-cv-1893-WSD, 2008 WL 269607, at *3 (N.D. Ga. Jan. 28, 2008) (citations
omitted).  The Court concludes that it can properly consider the alleged hearsay
evidence in this case because the evidence could be presented in an admissible form
at trial.  McMillian v. Johnson, 88 F.3d 1573, 1584 (11th Cir. 1996).

Defendants also object to affidavits submitted by Phillips in support of her
opposition to defendants' summary judgment motion, see [Doc. 135-12 (Pl's Aff.
Regarding Signing of Evaluation); Doc. 135-24 (Pl's Aff. in Support of Pending
Claims) at 1-16], and request that the Court decline to consider these affidavits.
See [Doc. 139-1 at 22 ¶¶ 122-25, 23 ¶¶ 126-30, 44 ¶¶ 274-76]; see also [Doc. 139 at 4-
5].  Specifically, defendants object to Phillips' "post-discovery" affidavits as sham
affidavits attempting to raise new allegations because Phillips previously "filed a
long, verified, narrative response to [their] interrogatory requesting her to 'describe
in detail all facts supporting [her] allegations, as set forth in [her] [c]omplaint,'" had

"many months to contemplate her claims in the wake of filing her first EEOC complaint," and "was given ample opportunity to discuss the facts she believed supported her allegations of retaliation over the course of two depositions and in response to [their] interrogatories."  [Doc. 139 at 5 (footnote omitted)].

"An affidavit may be considered a 'sham' affidavit 'when a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact . . . [and that party attempts] thereafter [to] create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony.'"   White v. Crystal Mover Servs., Inc., Civil Action No. 1:13–CV–1452–WSD–JSA, 2014 WL 4662371, at *19 (N.D. Ga. June 24, 2014), adopted as modified by 2014 WL 4662379, at *10 (N.D. Ga. Sept. 18, 2014) (alterations in original) (citation omitted) (quoting Tippens v. Celotex Corp., 805 F.2d 949, 954 (11th Cir. 1986)).  The Eleventh Circuit has cautioned that the sham affidavit rule "should be used sparingly, and the affidavit and deposition must contain inherent inconsistencies before the affidavit can be disregarded."  Wolk v. Seminole Cty., 276 F. App'x 898, 900 (11th Cir. 2008) (per curiam) (unpublished) (citation omitted).[5]  "A

---

[5] Additionally, "an affidavit may only be disregarded as a sham when a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact." nVision Global Tech. Solutions, Inc. v. Cardinal Health 5, LLC, 887 F. Supp. 2d 1240, 1259 (N.D. Ga. 2012) (citations and internal marks omitted).

court presented with such an inconsistency in a party's testimony may disregard the later 'sham affidavit' in favor of the earlier deposition testimony." White, 2014 WL 4662371, at *19 (citations omitted) (citing Van T. Junkins & Assocs. v. U.S. Indus., Inc., 736 F.2d 656, 658 (11th Cir. 1984)).  However, a "court must be careful to distinguish between discrepancies which create transparent shams and discrepancies which create an issue of credibility or go to the weight of the evidence." nVision Global Tech. Solutions, Inc., 887 F. Supp. 2d at 1260 (citation and internal marks omitted).

Phillips' affidavits are not internally inconsistent, and defendants have not shown that the affidavits directly contradict her deposition testimony.  Rather, it appears that her affidavits merely elaborate on and explain aspects of her deposition testimony.  "In considering a motion for summary judgment, a district court must consider all the evidence before it and cannot disregard a party's affidavit merely because it conflicts to some degree with an earlier deposition." See Kennett-Murray Corp. v. Bone, 622 F.2d 887, 893 (5th Cir. 1980) (citations omitted).[6]  Indeed, "[e]very discrepancy contained in an affidavit does not justify a district court's refusal to give credence to such evidence," and "[i]n light of the jury's role in resolving questions

---

[6] Decisions of the Fifth Circuit rendered before October 1, 1981, are binding precedent in the Eleventh Circuit.  Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

of credibility, a district court should not reject the content of an affidavit even if it is at odds with statements made in an early deposition." Tippens, 805 F.2d at 954 (citations omitted).  Therefore, the Court **OVERRULES** defendants' objection to Phillips' affidavits as a "sham."[7] Furthermore, as required on a motion for summary judgment, the Court construes the following pertinent facts of this case in the light most favorable to Phillips as the non-moving party.  Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1085 (11th Cir. 2004) (citing Damon v. Fleming Supermarkets of Fla., Inc., 196 F.3d 1354, 1358 (11th Cir. 1999)); see also Rose v. Wal-Mart Stores E., Inc., 631 F. App'x 796, 798 (11th Cir. 2015) (per curiam) (unpublished) (citation omitted).[8]

**B.**   **Statement of Facts**

In March 1989, Phillips began her employment with the Atlanta Police Department ("APD"), and sometime in 2000, she was assigned to the Validations

---

[7] Moreover, consideration of Phillips' affidavits and the statements challenged by defendants as inadmissible hearsay "does not alter the Court's analysis or its conclusion" in this case.  Hegre v. Alberto-Culver USA, Inc., 508 F. Supp. 2d 1320, 1327 (S.D. Ga. 2007), aff'd, 275 F. App'x 873 (11th Cir. 2008) (per curiam) (unpublished).

[8] Accordingly, what follows is a summary of facts as presented by defendants in their statement of facts, see [Doc. 117-1], and the Court will note those occasions in which Phillips offers additional or conflicting factual statements that are supported by the evidence of record, J.D.P. v. Cherokee Cty., Ga. Sch. Dist., 735 F. Supp. 2d 1348, 1350 (N.D. Ga. 2010).  Finally, the Court has taken additional facts from the pleadings and supporting exhibits in order to fully describe Phillips' allegations.

Unit of the APD.[9]  [Doc. 130 (Pl.'s Dep. Vol. I) at 16-17 pp. 15-16, 88-101 pp. 87-100;

Doc. 130-1 (Pl.'s Dep. Vol. II) at 51-52 pp. 260-61; Doc. 117-13 at 1; Doc. 117-14 at 1;

Docs. 135-1 & 135-2].  The APD's ISS department was supervised by a chain of

command, which included Major Joseph Spillane ("Major Spillane") and Major

Darryl Tolleson ("Major Tolleson") in overall command of the ISS from 2011

through 2012; Tamikia Riggins ("Riggins") was the Unit Commander of the

Validations Unit since 2006; Judith Barton ("Barton"), who reported to Riggins, was

the First-Line Supervisor of the Validations Unit since 2011; and Lieutenant Clifton

---

[9] The Validations Unit is a subdivision of the APD's Central Records Unit, which is also comprised of Central Records and the Georgia Crime Information Center ("GCIC") subdivisions, that all fall under the APD's Information Services Section ("ISS") department.  [Doc. 119 (Spillane Dep.) at 8-9 pp. 7-8; Doc. 119-2 at 1-10; Doc. 121 (Lt. C. Johnson Dep.) at 8-9 pp. 7-8].  Along with the Central Records Unit, the Electronic Maintenance Unit, the Identification Unit ("ID Unit"), and the Crime Lab all make up the ISS.  [Doc. 119 at 8-9 pp. 7-8; Doc. 121 at 8-9 pp. 7-8].  Each unit plays a role in storing and backing up incident, accident, and related police reports into a computer system linked with the GCIC and the Federal Bureau of Investigation's National Crime Information Center's databases.  [Doc. 119 at 9 p. 8; Doc. 119-2 at 1-10].  The Validations Unit, in particular, is responsible for validating "hot files" related to stolen items, missing persons, wanted persons, guns/articles, and vehicles, and employees within this subdivision are tasked with performing validations for these types of information.  [Doc. 120 (Riggins Dep.) at 10 p. 9, 21 p. 20; Doc. 121 at 13-16 pp. 12-15; Doc. 121-1; Doc. 124 (Holmes Dep.) at 7 p. 6; Doc. 123 (Barton Dep.) at 79 p. 78; Docs. 123-11 & 123-12].  Additionally, Validations Unit employees audit the work of the Central Records Unit.  [Doc. 121 at 16 p. 15].

Johnson ("Lt. Johnson") was the Supervisor of the Central Records Unit.[10] [Doc. 120 at 8 p. 7, 12 p. 11, 46 p. 45; Doc. 119 at 8 p. 7, 14-16 pp. 13-15; Doc. 121 at 9-10 pp. 8-9; Doc. 123 at 18 p. 17; Doc. 130-1 at 76-77 pp. 285-86]. From 2002 until 2004, defendant Norton was Phillips' direct supervisor. [Doc. 130-1 at 86-87 pp. 295-96, 91 p. 300].

In December 2002, Phillips filed a complaint with the APD's Office of Professional Standards ("OPS"), in which she alleged that defendants Johnson and Grant, who were also assigned to the Validations Unit, had subjected her to sexual harassment.[11] [Doc. 130 at 102-11 pp. 101-10; Doc. 130-1 at 6-8 pp. 215-17; Doc. 117-4; Doc. 131 at 1-15]. During the course of the OPS investigation of her complaint, Phillips was temporarily transferred to the Central Records subdivision, but she retained the same title and position, and she was eventually returned to the

---

[10] Majors Spillane and Tolleson typically only addressed "big picture" issues, including budgeting, purchasing, deadlines, supplies, and certain escalated personnel matters, [Doc. 119 at 14-16 pp. 13-15], whereas general personnel matters were initially handled by the first-line supervisor and then escalated, if necessary, to the unit commander, [Doc. 120 at 46 p. 45].

[11] Phillips believed that defendants Johnson and Grant were sent to harass her for participating in an earlier, unrelated investigation into alleged criminal misconduct at the APD. [Doc. 130 at 118-20 pp. 117-19]. Phillips complained about Johnson and Grant's alleged sexual harassment to Norton, her immediate supervisor, who met with Johnson and Grant about their actions, but Phillips claims that they continued their harassment even after they met with Norton. [Id. at 108-09 pp. 107-08].

Validations Unit after OPS concluded the investigation in 2003.[12]  [Doc. 130 at 117

p. 116, 121 p. 120].  Following her return to the Validations Unit in 2003, Phillips

alleges that she became "the butt of the jokes,"[13] and she therefore requested and

accepted a permanent lateral transfer to the Central Records subdivision in 2004.[14]

[Id. at 127-31 pp. 126-30; Doc. 130-1 at 67-69 pp. 276-78].

---

[12] On January 15, 2003, OPS concluded the investigation and determined that there was "insufficient evidence . . . to prove that [Grant and Johnson] made inappropriate actions or interactions with [] Phillips during the months of October and November 2002," and they were therefore exonerated.  [Doc. 117-4 at 1-5]; see also [Doc. 130 at 117 p. 116; Doc. 130-1 at 6-8 pp. 215-17].

[13] For example, Phillips claimed that defendant Grant was singing "hi ho," "hi ho" in the office, which she interpreted to mean "bi ho," "bi ho."  [Doc. 131 at 74].  She also claimed that she "was being retaliated against by the supervisors for the OPS complaint."  [Id.].  In particular, Phillips alleged that Norton asked her to advise a supervisor every time she left the office and to state where she was going, whereas other employees were not asked to do the same.  [Id.].

[14] During this time, Phillips' son had passed away as a result of an automobile accident and she was also mourning his death.  [Doc. 130 at 121 p. 120, 127-28 pp. 126-27].  Phillips alleges that Validations Unit employees taunted her following her son's death by making statements such as, "Oh, I'm so sorry, Sharon, your son died" while smiling, or "Girl, you look like you okay to me.  You ain't looking crazy yet.  You not even wearing your clothes on backwards."  [Id. at 122-25 pp. 121-24, 127 p. 126].  Phillips also testified that sometime following her son's death, she had financial issues and approached defendant Grant and "reminded him of the conversation where he said if [she] should ever need any help or money, to let him know" and they spoke about the previous sexual harassment complaint, and he said, "Sharon, I really don't remember exactly everything that happened" since at "that time I drank a lot and I came to work drunk," but he gave her $3,000.00 to help her with her financial situation.  [Doc. 130-1 at 61-62 pp. 270-71].

While working the morning shift in the Central Records subdivision, Phillips alleges that several conflicts with her co-workers arose, including that she refused to sleep during her shift while other co-workers would, that co-workers would cause her work to go missing, that they harassed her about the clothes she wore to work, and that certain co-workers and her supervisor at the time plotted against her and lured her to a Thanksgiving meeting under false pretenses where they then took turns telling her what they did not like about her. [Doc. 130 at 131-41 pp. 130-40]; see also [Doc. 117-13 at 2-4].[15] Subsequently, Phillips was transferred to the day shift in the Central Records subdivision where she had the same duties and office as the morning shift. [Doc. 130 at 141-42 pp. 140-41]. On her new shift, Phillips alleges that a co-worker called her "crazy," that co-workers taunted her, interrupted her conversations, and caused other interpersonal conflicts, [id. at 143 p. 142]; see also [Doc. 117-13 at 4-5],[16] and she eventually filed a grievance against her co-workers and supervisor in the Central Records subdivision in October of 2009, causing her

---

[15] Phillips reported some of these incidents to Major Dalton, the Unit Commander for the Central Records subdivision, and he informed her that "people felt that [she] was a problem for them." [Doc. 130 at 128 p. 127, 138 p. 137].

[16] Phillips maintains that she reported the alleged harassment to supervisors Kimberly Bennett ("Bennett"), Katherine Huey, and Lt. Johnson in June 2007, but that she continued to be called "Crazy," "Bipolar," and "Sybil" by her co-workers and supervisors. [Doc. 117-13 at 6 (all caps omitted)]. She also alleges that "Sgt. Jones" with OPS advised her that she "may want to leave APD" since her "coworker will never leave [her] alon[e]." [Id. at 2].

to be temporarily transferred, upon her request, back to the Validations Unit in December of 2009,[17] [Doc. 130 at 149-59 pp. 148-58; Doc. 130-1 at 17-18 pp. 226-27; Doc. 117-7 at 54-90].  Phillips subsequently voluntarily withdrew this grievance, [Doc. 130 at 158-59 pp. 157-58; Doc. 117-7 at 55]; however, she remained in the Validations Unit after she indicated that she had no problem with this Unit, [Doc. 130 at 144-56 pp. 143-55, 159-61 pp. 158-60; Doc. 130-1 at 17-18 pp. 226-27].

Phillips testified that she began to have issues with her co-workers in the Validations Unit within four to five months of being reassigned to this Unit.  [Doc. 130 at 168 p. 167].  For example, she stated that certain employees began to watch her, that on one occasion, Cage yelled, "We tired of you.  We having to walk on eggshells because of you," that her files went missing on multiple occasions, and that defendant Johnson would sometimes "get up out of his seat, cringe up, and make steps towards [her] to lunge."  [Id. at 185 p. 184, 199-200 pp. 198-99 (internal marks omitted)].  Sometime in 2010, Phillips reported these incidents to Riggins via e-mail, as well as to Major Tolleson since Riggins was out of the office, see [id. at 200-02 pp. 199-201], and upon Riggins' return, she advised Phillips that employees in the Validations Unit had complained about her recently removing a mini

---

[17] Upon her return to the Validations Unit, Phillips worked with defendant Johnson, Cynthia Willis ("Willis"), Ladine Cage ("Cage"), Marlon Portis, Jody Tucker ("Tucker"), Marquis James, and Blanche Holmes ("Holmes").  [Doc. 130 at 163-64 pp. 162-63].

refrigerator that Phillips had previously purchased for the Unit in 2003,[18] [id. at 171-73 pp. 170-72, 203 p. 202; Doc. 130-1 at 72-73 pp. 281-82]. Riggins instructed Phillips to return the refrigerator, but Phillips refused and she was subsequently referred to Behavioral Services. [Doc. 130 at 204-06 pp. 203-05].[19]

During this time in 2010, Phillips also worked part-time for UPS, and she suffered an on-the-job head injury that resulted in a concussion. [Id. at 195 p. 194, 198 p. 197; Doc. 130-1 at 79-81 pp. 288-90]. Her physical symptoms worsened, and she subsequently took an approximately 18-month medical leave of absence from her employment with the City. [Doc. 130 at 195 p. 194; Doc. 130-1 at 78-81 pp. 287-90]. Upon Phillips' return to the Validations Unit from her medical leave of absence, Officer Alex Robinson ("Officer Robinson") began working in the Validations Unit.

---

[18] Phillips explained to Riggins that she "gave the refrigerator for the unit to be a unit, to pull everyone together," but that since employees "kept taunting [her] or their behavior or their hatred towards [her]," that removing the refrigerator was her way of "erasing any problems" and that she would not be decorating anymore and that not having the refrigerator would end all of the bickering about who was going to clean it out. [Doc. 130 at 203-04 pp. 202-03].

[19] Phillips alleges that Riggins told her at some unknown time that she "got what [she] deserved" after she continued to complain about her co-workers and refused to return the refrigerator. See [Doc. 135-24 at 11 ¶ 47].

[Doc. 118 (Robinson Dep.) at 9 p.8].[20]   On April 20, 2012, Barton sent Major Spillane

an e-mail, which stated in relevant part:

> I am requesting a meeting with you to discuss returning [Phillips] to
> her work assignment.   [] Phillips was assigned to our unit on a
> temporary basis until an internal investigation was completed because
> of an altercation she had in Central Records and it has been over a year.
> [] Phillips is causing a hostile work environment for two employees in
> this unit (Sandra Edwards and Alex Robinson).  The reason for this
> harassment is because of a personal nature.  [] Phillips stated to me that
> she is in a personal relationship with [Officer] Robinson in which he
> has denied this fact and she believes Ms. Edwards has an interest in
> him.  I have explained to [] Phillips that all personal issues should be
> left outside the office.  Ms. Edwards has stated to me that she is not
> involved with [Officer] Robinson and [] Phillips has continued to
> harass her everyday and she is overwhelmed with working in a hostile
> environment. [] Riggins and myself have had meetings with all parties
> and advised them on the protocol of a hostile free work environment
> but [] Phillips has continued to cause friction especially in the absence
> of [] Riggins or myself.  I don't feel a resolution can be reached at our
> level and would like to discuss returning [] Phillips to her work
> assignment.

---

[20] Officer Robinson testified that employees called Phillips names and that
when he first started working in the Validations Unit in August 2011, defendant
Johnson warned him to stay away from Phillips or "she's going to file sexual
harassment charges on you.  You're going to find yourself in trouble."  [Doc. 118 at
9 p. 8, 32 p. 31, 41 p. 40].  Defendant Johnson, however, denies that he ever advised
any employees in the Validations Unit, including Officer Robinson, to stay away
from Phillips.  [Doc. 126 (J. Johnson Dep.) at 59-60 pp. 58-59].

[Doc. 119-21 at 5]; see also [Doc. 119 at 80-90 pp. 79-89].[21]  Major Spillane responded on May 11, 2012, indicating that he had been "considering a resolution," but that since Phillips was "transferred a while ago as the result of a hostile work environment Grievance, [] it [was] not as simple as moving her back to what she at one time considered a Hostile Work Environment." [Doc. 119-21 at 3]; see also [Doc. 119 at 85 p. 84, 89 p. 88].[22]

On the following day, Riggins responded to Major Spillane in pertinent part as follows:

> [Phillips] can work under another supervisor in Central Records without having any contact with the supervisor in which she had the problem with.  When she was moved to Validation it was explained to me that it was to be under a temporary basis, which has now been extended to over a year.  The thought was that since we were a "work alone" unit that she would not have conflict with any one else in the

---

[21] Barton again e-mailed Major Spillane on May 1, 2012, to request a meeting with him and Riggins to discuss Phillips' "situation within the Validations Unit" because she did not "want this situation to escalate to a level that [was] unmanageable." [Doc. 123-24 at 1].  She again e-mailed him on May 11, 2012, asking whether a resolution had been reached.  [Id. at 2].  Barton testified that the "environment in the office was [] toxic, it was a toxic situation" and that she "felt that [she] couldn't handle it on [her] level" since "[e]very time [she] had a meeting with [] Phillips, [Sandra] Edwards and [Officer] Robinson, the situation tend[ed] to escalate into something else."  [Doc. 123 at 129 p. 128].

[22] Major Spillane also testified that the "other issue was [he] spoke with the rest of the supervisors in Central Records, GCIC, and ID, and none of them wanted to take [] Phillips on under their command. . . . So nobody wanted to supervise her because of her reputation as being a little bit hard to supervise or to deal with." [Doc. 119 at 82 p. 81].

unit.  It worked fine for a while and now that is no longer the case.
[Phillips] is now creating a hostile work environment for an employee
who is assigned to the unit.  I don't think you all understand the
seriousness of this, the conflict has reached a boiling point and if she is
not removed from the office I feel that further action will be taken.  It's
a constant battle from week to week, its so bad that we can not leave
the office unsupervised.  There have almost been actual fights in the
office.  Myself, [] Barton and the other[] employees should not have to
be subjected to this type of behavior.  We as supervisors should not
have to second guess our schedules in an effort to not leave her alone
with others.

While I understand that you are working to get a resolution reached,
myself or [] Barton do not want to be held responsible if something of
a more serious nature should ensue in the office in our absence. . . .

So as a supervisor under your command I respectfully ask[] that []
Phillips be sent back to her original unit. . . . I feel that the unit as a
whole has been subjected to her behavior for far too long, her actions
have affected the office culture in a very negative way, we have staff
seeking positions else where in an effect not to work with her.  I don't
think that its fair for those assigned to the unit to work under these
conditions any longer and I don't want to be held responsible for her
actions when I am not present.

[Doc. 119-21 at 2]; see also [Doc. 119 at 80-90 pp. 79-89; Doc. 120-11 at 2-3].  Chief

Spillane responded that he had reviewed Phillips' personnel file, but that there were

no documented disciplinary issues and that "[m]oving a problem employee simply

because a supervisor is unable to supervise is never a good idea[.]"  [Doc. 119-21 at

2]; see also [Doc. 119 at 83-84 pp. 82-83].

On August 21, 2012, Phillips filed a grievance against co-worker Holmes,

regarding an incident where Holmes allegedly "aggressively approach[ed Phillips]

17

at [her] work station . . . going off that she appreciate[d] [her] locking a door that she could not renter [sic] into the office from Central Records."  [Doc. 117-7 at 137]; <u>see also</u> [Doc. 119-7; Doc. 119 at 23-26 pp. 22-25].  Phillips also complained of another incident from the previous month that allegedly involved Holmes pushing a chair in front of Phillips "so hard that the chair slammed into the wall which made a very loud sound."  [Doc. 117-7 at 138]; <u>see also</u> [Doc. 119-10 at 25; Doc. 130-1 at 17-18 pp. 226-27].

On August 23, 2012, Riggins advised Major Spillane that she did not feel Phillips' grievance against Holmes could be addressed at her level, that "[a]t this point [Phillips] has had some type of disagreement with all of her peers and does not seem to be able to get along with any of them," that "[e]very action made by anyone always ends in a complaint, whether it be a co-worker cleaning and sanitizing their desk, laughing and talking amongst other co-workers, walking to[o] close to her work area, [or] looking at her with 'evil' in their eyes," and that she was therefore forwarding the grievance to him for his review and remedy.  [Doc. 117-7

at 136].[23]  Major Spillane met with Phillips to address the grievance against Holmes on September 6, 2012.  See [Doc. 119 at 23-26 pp. 22-25; Doc. 119-7].

On September 7, 2012, Phillips filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") against the City's APD, alleging discrimination based on retaliation that occurred between September 1, 2011, and September 6, 2012 and was a continuing action.  [Doc. 117-14]; see also [Doc. 130-1 at 52 p. 261].  Specifically, Phillips charged as follows:

> I began employment with the above-named employer on March 27, 1989, as a Data Entry Clerk, later advancing to a Police Report Technician.  In 2002, I complained of sexual harassment by a coworker to my employer.  In September 2011, I was told by newly assigned workers that I should be avoided, that I am trouble for my participation in prior EEO activity.  Since September 2011, derogatory comments, warnings to male employees to beware of me, workplace violence, and discussions regarding my prior EEO activity have been mentioned in the office by my current supervisors and coworkers.  I filed a grievance with my employer on September 6, 2012, regarding the conduct in the office environment.
>
> I believe that I am being retaliated against for engaging in a protected EEO activity, in violation of Title VII of the Civil Rights Act of 1964, as amended.

---

[23] On August 31, 2012, Phillips filed additional grievances against Riggins, Tucker, defendant Johnson, Sandra Edwards, Willis, Bennett, and Cage, for "[r]etaliation from a 11yrs ago sexual harassment claim[.]"  [Doc. 119-8 at 3-5, 7-9; Doc. 117-7 at 1, 4, 7-11, 13].  Lt. Johnson addressed these additional grievances because Major Spillane was out of town when Phillips filed them, and, after conferring with Major Spillane, Lt. Johnson forwarded these grievances to the APD's Personnel division to investigate and handle.  [Doc. 121 at 28-32 pp. 27-31; Docs. 121-14 & 121-15].

[Doc. 117-14].

On September 18, 2012, Major Spillane sent the Deputy Chief a memorandum,

stating in relevant part:

> Phillips filed a Grievance on 8/21/2012 against a co-worker . . .
> Holmes.  This is a frivolous grievance over [] Holmes confronting []
> Phillips about locking her out of the office.  Her grievance
> memorandum and explanation concerns me because it references []
> Phillips almost irrational fear of being attacked by [] Holmes, although
> there is no historical evidence that [] Holmes would become violent in
> the workplace.  The memo also reads as though [] Phillips has some
> paranoid feelings about her co-workers.
>
> I held a Grievance Hearing on September 6, 2012 with [] Phillips.  It
> seems to me that she feels that almost everyone has a problem with her.
> She also continued to mention past events, things that have happened
> over the course of over a decade.  She also referenced going to OPS as
> a "whistleblower" on Central Records, Validations and GCIC, although
> she did not wish to discuss "what she knew" during this hearing.  Her
> remedy to the grievance was to have [] Holmes attend Anger
> Management Counseling.  I considered completing an OPS File on []
> Holmes for courtesy however I met with all supervisors in the Unit
> who state [] Phillips is the continual problem and is continuing to target
> other employees.  They state she has an interest in a male police officer
> assigned to the unit and is upset that another female employee is
> dating this male.  I do not feel there is a remedy to this Grievance
> except an evaluation of [] Phillips by [the Employee Assistance
> Program ("EAP")].
>
> This morning, I reviewed additional Grievances filed by [] Phillips. . .
> . In all these Grievances [] Phillips claims that her co-workers and
> supervisors are retaliating against her for a Sexual Harassment Claim
> she filed over 11 years ago, which was Not-Sustained. . . . At this point
> when I consider one employee is continuously disrupting the Units in
> ISS, it appears a mandatory behavioral review is warranted for

[Phillips].   She is distracting the work being accomplished in Validations and because she has had previous issues with almost the entire staff at Central Records, GCIC and Validations, there are no work assignments in ISS where she would not be working with someone who has issues with her in the past.

As an interim action, and because [] Phillips appears to be uncomfortable around ALL her co-workers and supervisors, I am going to have to move her to a special assignment sorting old Identification Records that keeps her isolated from other employees.

As a permanent action, I would like a behavioral review by EAP, and her removal from ISS as she cannot work well with others based on a long history of behavior.

[Doc. 119-7]; <u>see also</u> [Doc. 119-8; Doc. 119 at 24 p. 23].[24]  Effective September 24, 2012, Phillips was temporarily transferred from the Validations Unit to the ID Unit. [Doc. 119 at 23-40 pp. 22-39; Doc. 119-7; Doc. 117-13 at 13].[25]

---

[24] On September 20, 2012, Major Spillane advised Barton and Riggins, among others, that he was transferring Phillips to "ISS Admin for an administrative project" and that her "off days and shifts [would] be the same."  [Doc. 123-24 at 4].

[25] Major Spillane testified that "[b]ecause [Phillips] started filing multiple grievances from 11 years' worth of issues that she seemed to have been holding onto, . . . [he] felt it would be best to move her because of not just of the chair issue, but when you come to [him] with grievances on basically everybody you work with, . . . it's coming on [him] to do something to move you out of that environment." [Doc. 119 at 36 p. 35]; <u>see also</u> [<u>id.</u> at 40 p. 39].  In the ID Unit, Phillips was assigned to work in a former interrogation room that had been converted into office space. [Doc. 118 at 108-09 pp. 107-08, 112 p. 111].

On October 1, 2012, Phillips filed several additional grievances against her co-workers, including Riggins, Barton, and Lt. Johnson.[26]   [Doc. 119-8 at 1-2, 6, 10-12; Doc. 117-7 at 2-3, 5-6, 12].   OPS conducted an official investigation into Phillips' grievances,[27] see [Docs. 139-2, 139-3, & 139-4]; see also [Doc. 119 at 23-26 pp. 22-25,

---

[26] In addition to these grievances, on October 29, 2012, Phillips anonymously complained that certain employees, including Riggins, Holmes, Willis, and Cage, were taking sensitive and confidential work material home, which was prohibited under certain policies and regulations, in order to receive overtime pay.   [Doc. 130 at 186-90 pp. 185-89; Doc. 120 at 16-17 pp. 15-16, 20 p. 19, 41 p. 40; Doc. 120-2 at 2–3; Doc. 120-6; Doc. 139-2 at 13-16].   Major Spillane asked Riggins about this allegation, but he did not conduct a full investigation since the OPS was conducting the official investigation into this accusation.   [Doc. 119 at 37-38 pp. 36-37; Docs. 139-2, 139-3, & 139-4; Doc. 135-13 at 1-71].   Subsequently, OPS's investigative findings showed that Riggins only took work home to complete it and to keep the Unit's work load current and that pay records indicated that none of the accused employees received any overtime pay.   [Doc. 139-2 at 15].

[27] Because the OPS was conducting the investigations, Major Spillane did not conduct his own investigation into Phillips' August or October of 2012 grievances, nor did he or Barton obtain a case or control number for the grievances as set forth in the Standard Operating Procedures because the grievances were sent to the Personnel Unit of the APD.   [Doc. 119 at 23 p. 22, 25-28 pp. 24-27, 30-31 pp. 29-30; Doc. 119-11 at 3; Docs. 139-2, 139-3, & 139-4; Doc. 123-25 at 2-3].   However, on December 7, 2012, Phillips filed a complaint with the OPS against Lt. Johnson and Riggins, alleging that her previous grievances had not been addressed and that she had not received a response from her Chain of Command, despite having made multiple written requests for information.   [Doc. 139-2 at 94-107; Doc. 135-5; Doc. 135-4 at 1-20].   Additionally, on December 10, 2012, Phillips filed a police report with the APD regarding the chair incident involving Holmes from July 2012, [Doc. 119 at 27-32 pp. 26-31, 43 p. 42; Doc. 119-10 at 23-25], and on December 20, 2012, she filed another police report with the APD, in which she reported that Riggins, Barton, Cage, Willis, defendant Johnson, and Tucker told other employees that she was crazy, that she practiced voodoo, not to eat anything from her because it could be poisoned, that she accused others of sexual harassment, and that she was bipolar,

32 p. 31], and OPS, between May 2013 and October 2013, either exonerated the individuals accused in some of the complaints or closed the complaint as not sustained,[28] see [Doc. 139-2 at 3-5, 79-87; Doc. 139-3 at 62-63].

────────────────

[Doc. 119-10 at 27].

[28] On March 4, 2013, the Deputy Chief sent Phillips a memorandum, in which she advised Phillips in pertinent part:

> The Support Services Division Administrative Office is in receipt of nine separate grievance forms that you have filled out. . . .
>
> Grievance submission number one appears to allege that a fellow employee is in need of anger management counseling. While that may be an opinion that you subscribe to, the grievance procedure does not authorize employees to refer co-workers for counseling. There is a formal mechanism for this process and ultimately, such a determination for its appropriateness would be made by Psychological Services.
>
> Grievance submission number two seems to follow along the same lines as grievance submission number one. Again, the belief that co-workers may need counseling is not by itself grievable.
>
> Grievance numbers three though nine all appear to revolve around an incident to have occurred 11-years ago. On the surface, the allegations do not appear grievable.
>
> Should additional information be provided that is relevant to the grievance process, then such information will be considered at that time.

See [Doc. 117-7 at 126].

On July 2, 2013, Phillips filed an OPS complaint, in which she alleged that Barton had forged her signature on a performance evaluation that was initiated in 2011 for the time period related to July 2011 through June 2012. [Doc. 130-1 at 18-36 pp. 227-45; Doc. 117-8; Doc. 119 at 51-79 pp. 50-78; Docs. 119-16, 119-17, & 119-18; Doc. 139-3 at 64-68]. In particular, at the end of her review period in June 2012, Barton rated Phillips as "Effective" under the third Critical Job Element, and she noted that while Phillips was "punctual and arrive[d] to work in a timely manner," she had "received verbal counseling in regards to creating a hostile work environment." [Doc. 119-18 at 9]. Phillips disputed this rating and associated notation when she met with Barton, as well as typed a rebuttal to the rating, [Doc. 130-1 at 18-36 pp. 227-45; Doc. 117-8; Doc. 119 at 51-79 pp. 50-78; Docs. 119-16, 119-17, & 119-18; Doc. 135-12 at 3 ¶¶ 10-12; Doc. 123 at 37-38 pp. 36-37, 48-49 pp. 47-48], but they both signed the evaluation together, [Doc. 123 at 66 p. 65]. Subsequently, Major Spillane, after meeting with Phillips on June 30, 2012, changed the evaluation rating from "Effective" to "Highly Effective" and created an amended performance evaluation that removed the reference to Phillips creating a hostile work environment.[29] [Doc. 130-1 at 18-36 pp. 227-45; Doc. 117-8 at 144-45; Doc. 119 at 51-

_____

[29] Major Spillane agreed with Phillips and "determined that [] Barton did not have sufficient documentation to rate [] Phillips 'effective' in any of the three Critical Job Elements based on the Performance Indicators and Sources." [Doc. 117-8 at 144; Doc. 135-12 at 5 ¶ 19]. He also concluded that "oral counseling in regards to

79 pp. 50-78; Docs. 119-16, 119-17, & 119-18; Doc. 135-12 at 4 ¶ 18].   Despite a

favorable resolution to her dispute of the evaluation, Phillips sought a criminal

arrest warrant for Barton in the Magistrate Court of Fulton County on June 26, 2013,

based on the alleged forged signature on her evaluation, but it was denied for lack

---

'creating a hostile work environment' . . . . was not sufficient justification . . . to rate
[] Phillips lower than 'Highly Effective,'" [Doc. 117-8 at 144], and he met with Barton
and advised her that there was no justification for the original rating, despite having
verbally counseled Phillips about a hostile work environment, [Doc. 123 at 53-64 pp.
52-63].   Phillips did not receive any additional information with respect to this
evaluation until she requested to receive a final copy of it on June 24, 2013.   [Doc.
135-12 at 5 ¶¶ 20-23].   The amended evaluation did not change the portion about
Phillips being punctual or arriving in a timely manner, but it contained Phillips'
alleged forged signatures with illegible initials beside the signatures on the portions
of the evaluation that are to be signed when the evaluation period is opened, along
with the higher rating and removal of the hostile work environment reference.   See
[Doc. 139-3 at 72, 76; Doc. 119 at 61-62 pp. 60-61; Doc. 135-12 at 6 ¶¶ 25-26].   Major
Spillane explained that Phillips had previously signed the top part acknowledging
the standards she will adhere to in her performance when the evaluation was
opened in 2011, but since the critical job element portions that are completed at the
closing period of the evaluation were amended to reflect the higher rating and to
omit the hostile work environment reference, and there were other administrative
errors with the evaluation as well, the signatures for those opening documents that
had previously been signed were missing and that someone must have placed
Phillips' signatures on the amended evaluation for only the top portions and then
initialed beside the signatures to indicate that he or she did so.   [Doc. 119 at 53-54 pp.
52-53]; see also [Doc. 123 at 45 p. 44].   Barton even acknowledged that Phillips'
signatures on the initial and amended evaluations were different, but at her
deposition testified, "Who signed it, how it was signed, I have no knowledge[.]"
[Doc. 123 at 115 p. 114].   Moreover, during the OPS investigation, Phillips admitted
to the investigator that the evaluation had not affected her in any way, but she
maintained that it was "part of a sexual harassment retaliation, discrimination,
hostile work environment, violation of work rules."   [Doc. 139-3 at 74].   In May 2014,
OPS closed the complaint against Barton as not sustained.   See [Doc. 139-3 at 64-65;
Doc. 139-4 at 79].

of probable cause following a hearing on August 2, 2013.  [Doc. 130-1 at 18-36 pp.

227-45; Doc. 117-8; Doc. 119 at 51-79 pp. 50-78; Docs. 119-16, 119-17, & 119-18].[30]

Phillips has not been in the office since early 2014, but she remains a current

employee of the City and has continuously received a paycheck.[31]  [Doc. 130-1 at 98-

113 pp. 307-22].  She has never been demoted during her employment with the City,

[id. at 92-93 pp. 301-02], and she admits that she never suffered a loss in wages, [id.

at 93 p. 302].  In fact, during the relevant time period, Phillips has always had and

---

[30] On July 3, 2013, Phillips sent a mass office e-mail to various individuals in the chain of command, in which she detailed many of her same complaints against her co-workers and supervisors, as well as additional complaints that were not previously included in any of her grievances or OPS complaints, and requested a status of her grievances.  [Doc. 119-10]; see also [Doc. 119 at 23-43 pp. 22-42; Doc. 135-9].  On July 9, 2013, Phillips took a medical leave of absence, [Doc. 135-14], and on July 30, 2013, she again sent another request for the status of her July 2013, April 2013, October 2012, and August 2012, grievances, see [Doc. 135-10].  On July 31, 2013, Sergeant Fred Watson with the OPS responded to Phillips that normally a written response is provided once the file is 60 days old, but that her file had not yet reached that point.  See [Doc. 135-11].

[31] Phillips vaguely testified to a health event that occurred at work in either June or July of 2014 which resulted in her being transported to the hospital in an ambulance, and she explained that she was advised not to return to work after that incident until the City could find a "safe place for [her] to work[.]"  [Doc. 130-1 at 98-100 pp. 307-09, 110-11 pp. 319-20].  She also testified that she spoke with Human Resources at various times and that while the Human Resources manager attempted to communicate with her about coming back to work, she directed her to speak with her attorney.  [Id. at 101-06 pp. 310-15].  Phillips is currently attending school to earn a bachelor's degree in psychology, which she has been studying since May of 2014.  [Id. at 116 p. 325; Doc. 130 at 13-15 pp. 12-14].

still receives benefits and a paycheck in the full amount of her salary from the City. [Id. at 93-95 pp. 302-04].

On March 7, 2014, Phillips originally filed this action, naming the APD as the sole defendant, and asserting Title VII claims of sexual harassment and retaliation, a claim for relief under the Civil Rights Act of 1991, and a pendent state law claim for intentional infliction of emotional distress.  See [Doc. 1].  Following the filing of two motions to dismiss, see [Docs. 5 & 13], and a failed attempt to amend her complaint, see [Docs. 12 & 15], Phillips filed her second amended complaint on October 20, 2014, asserting a Title VII claim for hostile work environment sexual harassment against the City, [Doc. 16 ¶¶ 24-28], a Title VII retaliation claim against the City and defendants Grant, Johnson, and Norton in their official capacities, [id. ¶¶ 29-34], a claim for relief under the Civil Rights Act of 1991 against all defendants, [id. ¶¶ 35-38], and a state law claim for intentional infliction of emotional distress against defendants Norton, Johnson, and Grant in their individual capacities, [id. ¶¶ 39-42].  Defendants moved to dismiss Phillips' Title VII hostile work environment sexual harassment claim, her Title VII retaliation claim to the extent it was asserted against the individual defendants, and her claim for relief under the Civil Rights Act of 1991.  [Doc. 17].  The Court granted defendants' motion, see [Docs. 19 & 24], leaving Phillips' Title VII retaliation claim against the City and her intentional

infliction of emotional distress claim against the individual defendants as the only remaining claims in this case.[32]   Defendants now move for summary judgment on plaintiffs' remaining claims, [Doc. 117], which Phillips opposes, [Doc. 135]. Defendants filed a reply in support of their motion, [Doc. 139], and the pending motion, having been fully briefed, is now ripe for ruling.

---

[32] Defendants point out that Phillips conceded that the scope of this litigation "ends with events that occurred during the 2012 calendar year." [Doc. 117-11 at 22 (emphasis omitted)]; see also [Doc. 130-1 at 38-40 pp. 247-49].  In addition, while defendants rely on various incidents that occurred throughout Phillips' employment with the City as "categories of retaliation" that Phillips "believes she has been subjected to," see [Doc. 117-1 at 7 ¶¶ 35-41], Phillips maintains that "she has been subjected to retaliation for having filed a sexual harassment claim," [Doc. 136 at 4 ¶ 35 (citing [Doc. 117-14])].  Phillips also admits that none of the allegations asserted against defendant Norton occurred after 2004, and that she only spoke to defendant Grant up to 2006 or 2007, and that their last communication was cordial.  [Doc. 130-1 at 59-62 pp. 268-71, 65-66 pp. 274-75, 91 p. 300].   She further testified that she had no issues with defendant Johnson from 2004 to 2009 and that when she initially began working with him again in 2009, she had no issues until about four to five months later when his personality, along with her other co-workers' attitudes, began to change, "but yet that wasn't any different from the way other co-workers were being treated before me" so she "looked at it just being me fitting in the way they treated most employees."  [Id. at 68-71 pp. 277-80].   She further admits that defendant Johnson never said anything sexually-related to her at any time following her 2002 grievance, though he did tell her two to three times sometime in 2010 that he spoke to her with his back turned towards her "[b]ecause [he was] afraid what happened before [was] going to happen again," and Barton had to speak with Johnson on several occasions about how certain statements he made could be taken out of context and about his viewing inappropriate material on his computer.  [Id. at 63-64 pp. 272-73, 72 p. 281, 86 p. 295; Doc. 123 at 90-91 pp. 89-90; Doc. 126 at 74-75 pp. 73-74; Doc. 118 at 77-79 pp. 76-78; Doc. 135-27].

28

## II.  SUMMARY JUDGMENT STANDARD

In deciding a motion for summary judgment, the Court views all evidence in the light most favorable to and draws all reasonable inferences in the favor of the non-moving party.  Gray v. City of Jacksonville, 492 F. App'x 1, 3 (11th Cir. 2012) (per curiam) (unpublished) (citations omitted); see also Fong v. Sch. Bd. of Palm Beach Cty., 590 F. App'x 930, 932-33 (11th Cir. 2014) (per curiam) (unpublished) (citation omitted).  "Summary judgment shall be granted if the movant[s] show[] that there is 'no genuine issue as to any material fact', such that the movant[s] [are] entitled to judgment as a matter of law."  Jerome v. Barcelo Crestline, Inc., 507 F. App'x 861, 863 (11th Cir. 2013) (per curiam) (unpublished) (quoting Fed. R. Civ. P. 56(a)); see also Holmes v. Ga. ex rel. Strickland, 503 F. App'x 870, 872-73 (11th Cir. 2013) (per curiam) (unpublished) (citations omitted); Young v. FedEx Express, 432 F. App'x 915, 916 (11th Cir. 2011) (per curiam) (unpublished) (citation omitted).

The parties moving for summary judgment bear the initial burden of demonstrating the absence of any genuine issue of material facts, upon which the non-moving party must then submit specific facts showing a genuine issue for trial.  Fed. R. Civ. P. 56(e); see also Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Premier Assocs., Inc. v. EXL Polymers, Inc., No. 1:08-cv-3490-WSD, 2010 WL 2838497, at *8 (N.D. Ga. July 19, 2010), aff'd in part, 507 F. App'x 831 (11th Cir. 2013)

(unpublished) (citations omitted). A party "opposing a properly supported motion for summary judgment may not rest upon mere allegation[s] or denials of [her] pleading, but must set forth specific facts showing that there is a genuine issue for trial." Jackson v. B & L Disposal, Inc., 425 F. App'x 819, 820 (11th Cir. 2011) (per curiam) (unpublished) (citation and internal marks omitted); see also Shuler v. Ingram & Assocs., 441 F. App'x 712, 715 (11th Cir. 2011) (per curiam) (unpublished) (citation and internal marks omitted); Bryant v. U.S. Steel Corp., 428 F. App'x 895, 897 (11th Cir. 2011) (per curiam) (unpublished) (citation omitted). "Speculation or conjecture cannot create a genuine issue of material fact." Shuler, 441 F. App'x at 715 (citation omitted); see also Howard v. Or. Television, Inc., 276 F. App'x 940, 941 (11th Cir. 2008) (per curiam) (unpublished) (citation omitted); Goodman v. Ga. Sw., 147 F. App'x 888, 891 (11th Cir. 2005) (per curiam) (unpublished) (citation and internal marks omitted) ("[A]ll reasonable inferences arising from the undisputed facts should be made in favor of the nonmovant, but an inference based on speculation and conjecture is not reasonable.").

"Moreover, the non-moving party cannot create a genuine issue through evidence that is 'merely colorable' or 'not significantly probative.'" Morales v. Ga. Dep't of Human Res., 446 F. App'x 179, 181 (11th Cir. 2011) (per curiam) (unpublished) (citation omitted); see also Jolibois v. Fla. Int'l Univ. Bd. of Trs., No.

15-14059, 2016 WL 3542239, at *1 (11th Cir. June 29, 2016) (per curiam) (unpublished) (citation omitted).  In addition, "[t]here is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment," Anyanwu v. Brumos Motor Cars, Inc., 496 F. App'x 943, 945-46 (11th Cir. 2012) (per curiam) (unpublished) (citation and internal marks omitted), and "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, summary judgment for the moving part[ies] is proper," Premier Assocs., Inc., 2010 WL 2838497, at *9 (first alteration in original) (citation and internal marks omitted).

## III.  DISCUSSION

Defendants seek summary judgment on Phillips' retaliation claim, contending that she has failed to present direct evidence of retaliation and has failed to establish a prima facie case based on circumstantial evidence.  See [Doc. 117 at 12-18; Doc. 139 at 5-14].  Defendants also assert that any allegations of conduct that occurred over 180 days prior to the filing of her EEOC charge are untimely.  [Doc. 117 at 18-19]. Finally, defendants contend that Phillips' intentional infliction of emotional distress claim asserted against the individual defendants is barred by the applicable statute of limitations and fails as a matter of law.  [Id. at 19-22; Doc. 139 at 16].  The Court will address the merits of defendants' motion with regard to Phillips' claims.

A.   **Timeliness of claims**

A plaintiff may not bring an action under Title VII "unless the alleged discrimination has been made the subject of a timely-filed EEOC charge." Alexander v. Fulton Cty., 207 F.3d 1303, 1332 (11th Cir. 2000), overruled on other grounds by Manders v. Lee, 338 F.3d 1304, 1328 n.52 (11th Cir. 2003) (citing 42 U.S.C. § 2000e-5); see also Wilkerson v. Grinnell Corp., 270 F.3d 1314, 1317 (11th Cir. 2001) (citation omitted) ("Before a [] plaintiff may sue . . . under Title VII, she must first exhaust her administrative remedies."). To be timely, an EEOC charge must be filed within 180 days after the alleged unlawful employment practice occurred. Alexander, 207 F.3d at 1332; see also Clark v. City of Macon, 860 F. Supp. 1545, 1550 (M.D. Ga. 1994) (citation omitted). In the Eleventh Circuit, "[e]ven though the filing requirements are not jurisdictional in nature, they are necessary prerequisites–conditions precedent–to filing a claim in federal court." Watson v. Republic Airlines, Inc., 553 F. Supp. 939, 943 (N.D. Ga. 1982) (citing Jackson v. Seaboard Coast Line R.R., 678 F.2d 992, 1009-10 (11th Cir. 1982); Pinkard v. Pullman-Standard, a Div. of Pullman, Inc., 678 F.2d 1211, 1216 (11th Cir. 1982) (per curiam)). When a defendant disputes that a plaintiff has exhausted administrative remedies or denies that the plaintiff has fulfilled the preconditions to suit, the "plaintiff then

bears the burden of proving that the conditions precedent . . . have been satisfied." Jackson, 678 F.2d at 1010 (citations omitted).

Phillips filed her EEOC charge of discrimination on September 7, 2012, marking the retaliation box and indicating that the discrimination took place between September 1, 2011, and September 6, 2012, and that it was a continuing action.  See [Doc. 117-14].  Defendants assert that any allegations of conduct that occurred more than 180 days prior to the filing of this charge are time barred.  See [Doc. 117 at 18-19].  Phillips, on the other hand, argues that the "doctrine of continuing violation must apply as to encompass the entire history of harassment and abuse that [she] has asserted within her [EEOC charge]."  [Doc. 135 at 29].

The continuing violation doctrine permits a plaintiff to sue on an otherwise time-barred claim when additional violations of the law occur within the statutory period.  See Hipp v. Liberty Nat'l Life Ins. Co., 252 F.3d 1208, 1221 (11th Cir. 2001) (per curiam).   It exists to protect those plaintiffs who are unaware that discrimination is occurring until it results in a pattern of violations over time. Dumas v. Town of Mount Vernon, 612 F.2d 974, 978 (5th Cir. 1980), overruled on other grounds by Larkin v. Pullman-Standard Div., Pullman, Inc., 854 F.2d 1549, 1569 (11th Cir. 1988) (citation omitted) ("The focus is on what event, in fairness and logic, should have alerted the average lay person to act or protect his rights, or when

he should have perceived that discrimination was occurring.").  In other words, the continuing violation doctrine distinguishes between "[a] knowing plaintiff [who] has an obligation to file promptly or lose [her] claim" and "a plaintiff who is unable to appreciate that [s]he is being discriminated against until [s]he has lived through a series of acts and is thereby able to perceive the overall discriminatory pattern." Labady v. Gemini Air Cargo, Inc., 350 F. Supp. 2d 1002, 1011 (S.D. Fla. 2004) (first alteration in original) (quoting Sabree v. United Bhd. of Carpenters & Joiners Local No. 33, 921 F.2d 396, 402 (1st Cir. 1990)).  Under this logic, it may be appropriate to extend the 180-day period to file an EEOC complaint where a plaintiff is unaware of discrimination until it becomes a pattern over time.

In the present case, "most of [Phillips'] claims are in fact time barred because most of the matters about which [Phillips, a knowing plaintiff,] complains occurred more than 180 days before the filing of [her] EEOC charge and were spread across [at least a nine-year] span. . . . [involving] isolated acts[.]"  Richardson v. JM Smith Corp., 473 F. Supp. 2d 1317, 1334-35 (M.D. Ga. 2007).  Indeed, as defendants point out, Phillips' allegations, which suggest nothing more than personality conflicts between herself and almost all, if not all, of her co-workers, "concern different employees, supervisors, [and subdivisions] and isolated events."  [Doc. 139 at 8 (footnote omitted)].  Accordingly, the Court finds that the continuing violation

doctrine does not apply to Phillips' Title VII retaliation claim, and as a result, any allegations of conduct that occurred more than 180 days prior to the filing of her EEOC charge are time-barred.[33]  Thus, it appears that the only timely conduct about which Phillips complains concerns the grievances she filed against various co-workers and supervisors in 2012, including Bennett, Cage, Sandra Edwards, Holmes, defendant Johnson, Riggins, Tucker, and Willis, see [Docs. 119-8, 119-9, 119-12], and her subsequent complaints against Barton related to her performance evaluation, see [Doc. 117-8].

**B.**    **Title VII Retaliation Claim Against the City**

Phillips alleges that she was retaliated against for complaining about sexual harassment in the workplace in 2002.  [Doc. 136 at 4 ¶ 35 (citing Doc. 117-14)].  Title VII prohibits an employer from retaliating against an employee because the individual "opposed any practice" made unlawful by Title VII.[34]  See 42 U.S.C. §

---

[33] Although these time-barred allegations cannot serve as the basis of the claim, they remain relevant to timely claims as evidence which "illuminate[s] current practices which, viewed in isolation, may not indicate [retaliatory] motives." Allen v. Montgomery Cty., 788 F.2d 1485, 1488 (11th Cir. 1986) (citations omitted); see also E.E.O.C. v. Atlanta Gastroenterology Assocs., LLC, No. Civ.A.1:05CV2504-TWT, 2007 WL 602212, at *14 (N.D. Ga. Feb. 16, 2007), adopted at *1 (citation omitted) ("[T]he Court will consider evidence of alleged acts of discrimination [plaintiff] opposed outside the 180-day limitations period as background and context for the timely filed retaliatory discharge claim.").

[34] Title VII also prohibits retaliation against an employee "because [she] has made a charge, testified, assisted, or participated in any manner in an investigation,

2000e-3(a); <u>Kidd v. Mando Am. Corp.</u>, 731 F.3d 1196, 1211 (11th Cir. 2013) (citations omitted).  Phillips may support her claim of Title VII retaliation by offering either direct or circumstantial evidence.  <u>McNorton v. Ga. Dep't of Transp.</u>, 619 F. Supp. 2d 1360, 1373 (N.D. Ga. 2007) (citations omitted).  "Direct evidence is 'evidence that, if believed, proves the existence of a fact without inference or presumption.'" <u>Wilson</u>, 376 F.3d at 1086 (alterations omitted) (quoting <u>Burrell v. Bd. of Trs. of Ga. Military Coll.</u>, 125 F.3d 1390, 1393 (11th Cir. 1997)).  "Where direct evidence is present, summary judgment is not appropriate."  <u>Bryant v. Jones</u>, 696 F. Supp. 2d 1313, 1324 (N.D. Ga. 2010) (citations omitted).

In the absence of direct evidence, the Court evaluates a claim of retaliation in violation of Title VII by using the burden shifting framework articulated in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973).  <u>See</u> <u>Harris v. Fulton-DeKalb Hosp. Auth.</u>, 255 F. Supp. 2d 1347, 1360-61 (N.D. Ga. 2002), <u>aff'd</u>, 48 F. App'x 742 (11th Cir. 2002) (unpublished); <u>see also</u> <u>Adams v. City of Montgomery</u>, 569 F. App'x 769, 772 (11th Cir. 2014) (per curiam) (unpublished) (citation omitted).  Phillips must first establish a prima facie case.  <u>Berman v. Orkin Exterminating Co.</u>, 160 F.3d 697, 701 (11th Cir. 1998).  If Phillips establishes a prima facie case, an inference of retaliation arises, and the burden shifts to defendants to articulate a

---

proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e-3(a).

legitimate, non-retaliatory reason for its actions.  Id. at 702; see also Entrekin v. City of Panama City, 376 F. App'x 987, 997 (11th Cir. 2010) (per curiam) (unpublished) (citation omitted).  This burden is "exceedingly light."  Holifield v. Reno, 115 F.3d 1555, 1564 (11th Cir. 1997) (per curiam) (citation and internal marks omitted).  If defendants meet their burden of production, this inference of retaliation is erased, and the burden shifts back to Phillips to show that defendants' articulated reason is merely a pretext for retaliation.  Berman, 160 F.3d at 702.  Despite this burden-shifting framework, the "ultimate burden of persuading the trier of fact that the defendant[s] intentionally [retaliated] against [Phillips] remains at all times with [Phillips]."  Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981) (citations omitted).

Defendants argue that Phillips' retaliation claim fails because she has not established a prima facie case.  [Doc. 117 at 12-18; Doc. 139 at 5-14].  Phillips responds that she has established a prima facie case of retaliation by both direct, circumstantial, and mosaic evidence.  See [Doc. 135 at 17-28].[35]  The Court will

---

[35] Defendants challenge whether Phillips suffered a materially adverse employment action, see [Doc. 117 at 14-16; Doc. 139 at 10-13], and Phillips actually asserts that she has presented direct evidence of an adverse employment action, see [Doc. 135 at 22-23].  However, in doing so, Phillips "has improperly commingled the methodology for proving retaliation with direct evidence, which does not require a prima facie case analysis, and for proving retaliation with circumstantial evidence, which does require a prima facie case analysis."  Pollard v. Montgomery Cty., 66 F. Supp. 2d 1218, 1232 n.13 (M.D. Ala. 1999).  That is, "direct evidence generally is

address each of these grounds asserted by Phillips.

Phillips contends that she has presented direct evidence in support of her retaliation claim. [Id. at 22-23]. In particular, Phillips first points to a statement made by Riggins at some unspecified time that Phillips "got what she deserved" after she continued to complain about her co-workers and refused to return the refrigerator. [Id. at 23 (internal marks omitted) (citing Doc. 135-24 at 11 ¶ 47)]. Next, Phillips points to a comment made by Sgt. Jones in the OPS after she had complained about her co-workers on both the morning and days shifts in the Central Records subdivision in 2009 that she "may want to leave APD" since her "coworker will never leave [her] alon[e]." [Doc. 117-13 at 2]. Viewing the facts in the light most favorable to Phillips, as required when ruling on a motion for summary judgment, Phillips has failed to present direct evidence of retaliation.

The Eleventh Circuit narrowly defines "direct evidence," see Shedrick v. Dist.

---

offered in lieu of a prima facie case, whereas the establishment of a prima facie case is accomplished with circumstantial evidence." Id.; see also Kruger v. Principi, 420 F. Supp. 2d 896, 909 (N.D. Ill. 2006) (citation omitted) ("The direct evidence method is straightforward and unrelated to *McDonnel Douglas*."). In fact, "if the employment action in question is not an adverse employment action under Title VII, then direct evidence that the employer took the action in retaliation for [p]laintiff's statutorily protected activities would not preclude summary judgment." Vinson v. Dep't of Corr., 672 F. Supp. 2d 1247, 1253-54 (N.D. Fla. 2009). Nevertheless, to the extent Phillips intended to argue that she has direct evidence of retaliation, the Court will first address whether the statements she relies upon constitute direct evidence before analyzing whether Phillips' claim is supported by circumstantial evidence.

Bd. of Trs. of Miami-Dade Coll., 941 F. Supp. 2d 1348, 1367 (S.D. Fla. 2013), as evidence that "'if believed, proves the existence of a fact without inference or presumption,'" Holland v. Gee, 677 F.3d 1047, 1055 (11th Cir. 2012) (quoting Wilson, 376 F.3d at 1086); see also Permenter v. Fedex Freight, Inc., Civil Action No. 7:14-CV-104 (HL), 2016 WL 878496, at *6 (M.D. Ga. Mar. 7, 2016) (citation omitted). "Evidence that only suggests discrimination, or that is subject to more than one interpretation, does not constitute direct evidence." Merritt v. Dillard Paper Co., 120 F.3d 1181, 1189 (11th Cir. 1997) (internal citations omitted). "'[O]nly the most blatant remarks, whose intent could be nothing other than to discriminate' satisfy this definition." Mathis v. Wachovia Bank, 255 F. App'x 425, 429 (11th Cir. 2007) (per curiam) (unpublished) (citation omitted). "For a statement to constitute direct evidence, it must be made by a person involved in the challenged decision," and "the statements must directly relate in time and subject to the adverse employment action at issue." Obester v. Lucas Assocs., Inc., Civil Action File No. 1:08–CV–03491–MHS–AJB, 2010 WL 8292401, at *38 (N.D. Ga. Aug. 2, 2010), adopted by 2010 WL 8304884, at *4 (N.D. Ga. Sept. 7, 2010) (citations and internal marks omitted). That is, "[d]irect evidence relates to actions or statements of an employer reflecting a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee." Armor v. Fed. Express Corp. Servs.,

Inc., Civil Action File No. 1:12–CV–2719–TWT, 2014 WL 3396516, at *6 (N.D. Ga. July 11, 2014), adopted at *1 (citations omitted).

First, putting aside the issue of whether Riggins is even a decisionmaker in this case, Riggins' alleged statement is not sufficiently connected to any retaliatory action to qualify as direct evidence of retaliatory motive, and it certainly does not indicate, as Phillips suggests, that Riggins "intended to permit the employees['] acts of harassment and abuse . . . to continue."  [Doc. 135 at 23].  Indeed, "remarks that are isolated and unrelated to the challenged employment decision are not direct evidence of [retaliation]."  Hankerson v. Se. Ga. Health Sys., No. CV 2:12–00097, 2013 WL 5651905, at *10 (S.D. Ga. Oct. 15, 2013) (citation and internal marks omitted); see also Gonzalez v. Fla. Dep't of Highway Safety & Motor Vehicles Div. of Fla. Highway Patrol, 237 F. Supp. 2d 1338, 1350 (S.D. Fla. 2002), aff'd, 45 F. App'x 886 (11th Cir. 2002) (unpublished) (noting statement that plaintiff "got what he deserved" insufficient to support his claim).  In fact, "[a] biased statement, separate in time from the employment decision under challenge, is not direct evidence of [retaliation]."  Williamson v. Adventist Health Sys./Sunbelt, Inc., 372 F. App'x 936, 940 (11th Cir. 2010) (per curiam) (unpublished) (citation omitted).  Here, Phillips only offers her own testimony that Riggins made this statement to her at some unknown time and without offering any context surrounding the circumstances

40

under which the statement was made, and "the law of this Circuit is clear that such a stray remark cannot support a finding of [retaliatory] intent by itself." Crosby v. Gregory, No. CV 212–140, 2014 WL 4460501, at *12 (S.D. Ga. Sept. 10, 2014); see also Jackson v. Cal-W. Packaging Corp., 602 F.3d 374, 380 (5th Cir. 2010) (finding comment did not constitute direct evidence where plaintiff provided no evidence that the comment was made proximate in time to the challenged employment decision); Garcia v. Penske Logistics, LLC, CIVIL ACTION NO. 5:13–CV–85, 2014 WL 11188812, at *9 (S.D. Tex. Dec. 18, 2014), aff'd, 631 F. App'x 204 (5th Cir. 2015) (per curiam) (unpublished) (citations omitted) (finding several remarks to plaintiff did not constitute direct evidence since plaintiff did not direct the court to when the statements were made).

Moreover, the comment made by Sgt. Jones, a non-decisionmaker, from sometime in 2009 that Phillips "may want to leave APD" since her "coworker will never leave [her] alon[e]," [Doc. 117-13 at 2], after she had complained about most, if not all, of her co-workers in the Central Records subdivision, is not direct evidence because it is subject to more than one interpretation.  In addition, "[a] stray remark by a non-decisionmaker does not constitute direct evidence[.]"  Tobar v. Fed. Defenders Middle Dist. of Ga., Inc., 618 F. App'x 982, 986 n.4 (11th Cir. 2015) (per curiam) (unpublished) (citations omitted).  Therefore, "[t]he Court is persuaded that

the evidence relied upon by [Phillips] does not fit the traditionally narrow definition of 'direct evidence' applied by the Eleventh Circuit in employment discrimination cases." Walker v. Golden Pantry Food Stores, Inc., No. 3:04-CV-91(CDL), 2005 WL 3179988, at *10 (M.D. Ga. Nov. 29, 2005); see also Jones v. City of Coll. Park, 540 F. Supp. 2d 1300, 1316 (N.D. Ga. 2007). Accordingly, the Court will address Phillips' Title VII retaliation claim based on circumstantial evidence.

### 1.   *Prima Facie Case*

To establish a prima facie case of retaliation, Phillips must show that "(1) she engaged in protected activity under Title VII; (2) she suffered a materially adverse action; and (3) there was a causal connection between the two events." McCaslin v. Birmingham Museum of Art, 384 F. App'x 871, 875 (11th Cir. 2010) (per curiam) (unpublished) (citations omitted); see also Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53 (2006); Kidd, 731 F.3d at 1211 (citation omitted).[36]

Defendants argue that Phillips cannot establish a prima facie case of retaliation under Title VII because she has not shown that she suffered a materially

---

[36] Additionally, as pointed out by defendants, the Supreme Court has concluded that "Title VII retaliation claims require proof that the desire to retaliate was the but-for cause of the challenged employment action." Univ. of Tex. Sw. Med. Ctr. v. Nassar, 133 S. Ct. 2517, 2528 (2013) (citation omitted). Thus, to survive summary judgment, Phillips must show that the "unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." Id. at 2533.

adverse employment action.  [Doc. 117 at 14-16; Doc. 139 at 10-13].  Defendants further argue that Phillips has not presented a prima facie case of retaliation because she cannot show that the "desire to retaliate was the 'but-for' cause of the challenged employment action." [Doc. 117 at 17-18 (footnote omitted)]; see also [Doc. 139 at 13-14].  In response, Phillips contends that she has established that she engaged in protected activity, that she suffered an adverse employment action, and that the adverse employment action and the protected activity are causally linked. See [Doc. 135 at 17-28].[37]

---

[37] For purposes of defendants' motion, the Court will assume that Phillips has satisfied the requirement that she engaged in statutorily protected activity.  See Ryans v. Whatley, Civil Action No. 1:11–CV–46(MTT), 2012 WL 3260412, at *9 (M.D. Ga. Aug. 8, 2012) (citation omitted) ("Generally, 'protected expression' includes both complaints filed with the EEOC and those filed through an employer's internal grievance procedure.").  In her response to the motion for summary judgment, Phillips lists 15 instances of alleged protected activity, beginning with her 2002 complaint of sexual harassment.  See [Doc. 135 at 19-21].  However, other than her actions associated with the 2002 complaint of sexual harassment, Phillips has not shown that any of the other complaints, grievances, and police reports she lists actually qualify as protected activity under Title VII.  See Boone v. City of McDonough, No. 1:12–cv–1036–WSD, 2013 WL 4670480, at *22 n.23 (N.D. Ga. Aug. 29, 2013), adopted at *5, aff'd, 571 F. App'x 746 (11th Cir. 2014) (per curiam) (unpublished) (citation omitted) ("[O]nly opposition to discrimination on the basis of race, color, religion, sex, or national origin, the categories protected by Title VII, constitutes 'protected activity.'"); Ross v. City of Perry, No. 5:07–CV–433 (CAR), 2009 WL 3190450, at *12 (M.D. Ga. Sept. 30, 2009), aff'd, 396 F. App'x 668 (11th Cir. 2010) (per curiam) (unpublished) ("In order for an employee engaging in opposition activity to be protected under the anti-retaliation provision of Title VII, [s]he must be opposing conduct that is made an 'unlawful employment practice' by Title VII.").

Defendants maintain that Phillips, who never suffered any change or alteration to her job duties, benefits, or pay throughout her employment, and is still currently employed by the City despite not having reported to work since 2014, cannot show that she suffered a materially adverse employment action.  [Doc. 117 at 14-15; Doc. 139 at 11-13].  In response, Phillips asserts that she "sustained adverse employment action by way of not receiving assistance from her supervisors and chain of command in which the harassment, abuse and acts of mistreatment by her supervisors and co-workers was actually prevented."  [Doc. 135 at 24]; see also [id. at 27].

The "scope of [Title VII's] anti-retaliation provision extends beyond workplace-related or employment-related retaliatory acts and harm" and "is not limited to discriminatory actions that affect the terms and conditions of employment."  Burlington N., 548 U.S. at 64, 67 (citation omitted).  Therefore, an employee claiming retaliation need not show an adverse action that actually affected the terms and conditions of her employment.[38]  Crosby v. Mobile Cty. Pers. Bd., No. 05-17039, 2007 WL 245126, at *4 (11th Cir. Jan. 30, 2007) (per curiam) (unpublished)

_____

[38] In her response in opposition, Phillips relies on the wrong standard for addressing whether a plaintiff has suffered a materially adverse employment action when considering a retaliation claim.  See [Doc. 135 at 22].  Even more perplexing is Phillips' attempt to satisfy a prima facie case of discrimination, rather than retaliation, when addressing whether she suffered an adverse employment action.  See [id. at 23-25].

(citation omitted); <u>Arnold v. Tuskegee Univ.</u>, 212 F. App'x 803, 810 n.4 (11th Cir. 2006) (per curiam) (unpublished) (citation omitted).  Instead, Phillips must show that she suffered an action which a reasonable employee would find "materially adverse," that is, an action harmful to the point that it "could well dissuade a reasonable worker from making or supporting a charge of discrimination." <u>Burlington N.</u>, 548 U.S. at 57.  That is, "[a] challenged action must do more than merely affront a 'plaintiff's unusual subjective feelings' and cannot be a trivial harm that offends 'a general civility code for the American workplace.'" <u>Manns v. City of Atlanta</u>, Civil Action File No. 1:06-CV-0609-TWT, 2008 WL 150699, at *8 (N.D. Ga. Jan. 11, 2008) (quoting <u>Burlington N.</u>, 548 U.S. at 68).  And, "[a]lthough Title VII's protection against retaliatory discrimination extends to adverse actions which fall short of ultimate employment decisions, the plaintiff must still demonstrate some threshold level of substantiality." <u>Wesolowski v. Napolitano</u>, 2 F. Supp. 3d 1318, 1348 (S.D. Ga. 2014) (citation and internal marks omitted).  To determine whether an action is materially adverse, the Court considers the particular circumstances of the case. <u>Burlington N.</u>, 548 U.S. at 68.  As the Supreme Court has instructed, context matters. <u>Id.</u>

Phillips argues that defendants' recalcitrance in addressing her numerous complaints against her co-workers and supervisors and thereby failing to prevent

"the harassment, abuse and acts of mistreatment" she experienced constitutes a materially adverse employment action.   [Doc. 135 at 24, 27].   However, the undisputed facts show that the City attempted to address Phillips' complaints and grievances, to the extent they were grievable, including conducting official OPS internal investigations into her complaints.[39] See [Doc. 117-7 at 126; Docs. 139-2, 139-

---

[39] Although Phillips complains about the handling and processing of her grievances, see [Doc. 135 at 24], the undisputed evidence shows that each of her grievances were processed and handled in some manner.  Indeed, each time Phillips filed a grievance, she was transferred to another division while the investigation into her grievance occurred, and the OPS conducted full investigations into her complaints and either exonerated the individuals she complained against or closed the file as not sustained.  See [Docs. 139-2, 139-3, & 139-4].  Furthermore, with respect to most of her grievances, Phillips was advised that the actions she complained about or the relief she sought were not appropriate, but that additional information relevant to the grievance process would be considered should it be provided.  See [Doc. 117-7 at 126].  Thus, the undisputed evidence belies her assertions that the City turned a blind eye to her complaints with the intention of allowing the alleged harassment to continue, and Phillips' "decision to report what she perceived as discriminatory behavior does not immunize her from petty slights, snubbing, her perception of a lack of good manners or other minor annoyances that often take place at work and that all employees experience."  Simmons v. Boeing Co., No. 5:05-CV-28 (WDO), 2006 WL 2644913, at *14 (M.D. Ga. Sept. 14, 2006), aff'd, 251 F. App'x 647 (11th Cir. 2007) (per curiam) (unpublished).  Furthermore, to the extent Phillips considers the harassment itself as a materially adverse employment action, while the Eleventh Circuit "recently recognized a cause of action for retaliatory harassment, [i]n order to demonstrate such harassment, [] [Phillips] must show that the actions of the defendant[s] altered the condition of the workplace, creating an objectively abusive and hostile atmosphere."  Aristyld v. City of Lauderhill, 543 F. App'x 905, 909 (11th Cir. 2013) (per curiam) (unpublished) (citations and internal marks omitted).  "That is, to establish a prima facie case of retaliatory harassment, the allegedly adverse actions must [still] meet [Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993), standard]."  Swindle v. Jefferson Cty. Comm'n, 593 F. App'x 919, 928-29 (11th Cir. 2014) (per curiam) (unpublished)

3, & 139-4].  And, "[m]erely because [Phillips] may feel that other measures may have been appropriate does not mean that the employer's remedial actions were inadequate," especially since "the Eleventh Circuit has held that warnings and counseling of the harasser are enough where the allegations are substantiated."

<u>Wesolowski</u>, 2 F. Supp. 3d at 1348 (alteration in original) (citations and internal

_____

(citation omitted).   Here, the incidents relied on by Phillips simply "do not come close to establishing a prima facie case of retaliatory harassment under <i>Harris</i>'s standard[, n]or does [Phillips] argue otherwise."   <u>Id.</u> at 929.   Indeed, Phillips' allegations of harassment, which include being called names on occasion, being taunted by certain co-workers over her relationship with Officer Robinson and about her clothing, defendant Johnson taking steps to lunge at her, being told by her co-workers that they do not like her, being watched, co-workers telling others to stay away from her, an incident with a co-worker where the co-worker aggressively approached her and yelled at her about locking her out of the office, that her files were missing, that a co-worker pushed a chair in front of her that slammed into the wall, that co-workers were taking confidential work home, and that her supervisor forged her signature on an evaluation that actually increased her rating, among other allegations, <u>see generally</u> [Doc. 117-13], amount to nothing than more than isolated incidents, which are generally insufficient to establish a hostile work environment claim, <u>see</u> <u>Swanson v. Civil Air Patrol</u>, 37 F. Supp. 2d 1312, 1324 (M.D. Ala. 1998) (second alteration in original) (internal marks omitted) (quoting <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775, 788 (1998)) ("[I]solated incidents (unless extremely serious) will not amount to  discriminatory changes in the 'terms and conditions of employment.'"); <u>see also</u> <u>Butler v. Ala. Dep't of Transp.</u>, 536 F.3d 1209, 1214 (11th Cir. 2008); <u>Barrow v. Ga. Pac. Corp.</u>, 144 F. App'x 54, 57-58 (11th Cir. 2005) (per curiam) (unpublished).   In fact, Phillips' allegations amount to nothing more than the "ordinary tribulation[s] of the workplace that [are] not actionable."   <u>Baker v. City of Safe Harbor</u>, No. 8:07-cv-1120-T-23TGW, 2008 WL 4200147, at *20 n.35 (M.D. Fla. Sept. 12, 2008), adopted at *1 (citation omitted); <u>see also</u> <u>Terrell v. Paulding Cty.</u>, 539 F. App'x 929, 934 (11th Cir. 2013) (per curiam) (unpublished) (citation and internal marks omitted) ("[M]ere ostracism in the workplace is not grounds for a retaliation claim[.]").

marks omitted).   Indeed, Phillips "cannot rely on failure to take action against another employee to show that [s]he was subject to an adverse employment action." Id. (citation omitted).  Simply put, Phillips has "failed to establish a prima facie case of retaliation because each post-complaint incident, whether administratively exhausted or not, neither had a tangible, negative effect on her employment nor would have dissuaded a reasonable worker from making or supporting a charge of discrimination."  Swindle, 593 F. App'x at 928 (footnote and citations omitted).

More important, "the *Burlington* standard does not excuse a plaintiff from [her] obligation to actually show that the conduct at issue would objectively deter [her] from engaging in statutorily protected activity."  Archibald v. United Parcel Serv. Co., 33 F. Supp. 3d 1301, 1321 (N.D. Ala. 2014), aff'd, 620 F. App'x 836 (11th Cir. 2015) (per curiam) (unpublished) (citation omitted).   Here, the evidence indisputably shows that the City's "actions did *not* deter [Phillips] from engaging in statutorily protected conduct," id. (citation omitted), as she repeatedly complained about various conduct that occurred in two different subdivisions over the span of a decade, filed police reports with the APD regarding many of her co-workers and supervisors, sought an arrest warrant for one of her supervisors, and has filed two EEOC charges of discrimination, one of which is the subject of another pending action in this district, see Phillips v. City of Atlanta, et al., Civil Action No. 1:15-cv-3616-TWT-RGV.  Therefore, none of the conduct at issue here dissuaded

Phillips from making numerous internal complaints and charges of discrimination with the EEOC.  See Cayemittes v. City of N.Y. Dep't of Housing Preservation & Dev., 974 F. Supp. 2d 240, 261 n.16 (S.D.N.Y. 2013), aff'd, 2016 WL 860063 (2d Cir. Mar. 7, 2016) (unpublished) (collecting cases showing no material adversity where plaintiff was clearly not dissuaded from making complaints or filing charges of discrimination).  Thus, Phillips' "own conduct demonstrates that any reaction by [d]efendants to her complaints . . . did not dissuade her from continuing to make complaints" and "[t]his negates any claim that the alleged harassment directed toward [Phillips] constituted an adverse action for purposes of establishing a retaliation claim."  Matthews v. Corning Inc., 77 F. Supp. 3d 275, 298 (W.D.N.Y. 2014) (citation omitted).  Accordingly, Phillips has failed to establish a prima facie case of retaliation.[40]

---

[40] "Because the Court has determined that [Phillips] did not suffer an adverse employment action, the Court does not need to evaluate [her] retaliation claim under the but-for causation standard."  Matthews, 77 F. Supp. 3d at 299.  "However, even if [Phillips] could establish that she was subjected to an adverse employment action, her retaliation claim[] would fail because she cannot establish but-for causation."  Id.  Indeed, the "ultimate issue is whether the retaliation would not have occurred but for the protected conduct," Perry v. Ala. Alcoholic Beverage Control Bd., 973 F. Supp. 2d 1263, 1294 (M.D. Ala. 2013), aff'd in part, 627 F. App'x 823 (11th Cir. 2015) (per curiam) (unpublished) (citation omitted); see also Edwards v. Gwinnett Cty. Sch. Dist., 977 F. Supp. 2d 1332, 1333-34 (N.D. Ga. 2013), and for the reasons discussed in defendants' briefs, see [Doc. 117 at 17-18; Doc. 139 at 13-14], Phillips "has failed to produce evidence raising inferences that any of the alleged materially adverse actions flowed from any one instance of protected activity."  [Doc. 139 at 13].  Phillips argues that the harassment she experienced was continuous from the

## 2.    *Convincing Mosaic of Circumstantial Evidence*

Phillips generally asserts that "[e]vidence of pretext so as to rebut a prima facie cause of action for discrimination, which in this matter, for retaliation may also be established by a 'convincing mosaic of discrimination.'"  [Doc. 135 at 26 (citing Smith v. Lockheed Martin, 644 F.3d 1321, 1328 (11th Cir. 2011))].  However, for the reasons already discussed, the circumstantial evidence cited by Phillips, see [id. at 27-28], does not support an inference of retaliatory motive on the part of defendants, much less establish a "convincing mosaic" sufficient to withstand defendants' motion for summary judgment.  Indeed, Phillips has failed to "produce[] any evidence, outside of [her] own conclusory say-so, that would support an inference of [retaliation] from the circumstances."  Flowers, 803 F.3d at 1337-38; see also Hill v. Oil Dri Corp. of Ga., 198 F. App'x 852, 858 (11th Cir. 2006) (per curiam) (unpublished) (citation omitted) (noting "unsupported conclusory statements have no probative value in opposing summary judgment").  "Because [Phillips] has the

---

time she filed her sexual harassment complaint in 2002, [Doc. 135 at 27-28], but her own EEOC charge states that the retaliation took place between September 1, 2011, and September 6, 2012, and was continuing, [Doc. 117-14], which is almost a decade removed from her 2002 sexual harassment complaint, and she simply has failed to connect any of the timely conduct about which she complains to such distant protected activity so as to satisfy the but-for causation standard.  Although Phillips asserted in numerous grievances in 2012 that the conduct she experienced was due to her 2002 sexual harassment complaint, see [Doc. 119-8], she has not provided any evidence beyond her own conclusory say-so to support this contention.  See Flowers v. Troup Cty., Ga., Sch. Dist., 803 F.3d 1327, 1337-38 (11th Cir. 2015).

burden of persuasion . . ., it is [her] responsibility to advance sufficient evidence of [retaliation] to create a triable factual dispute," <u>Flowers</u>, 803 F.3d at 1338, but she has failed to do so, <u>Cunningham v. AutoZoners, LLC</u>, Civil Action No. 12–00538–KD–B, 2013 WL 6008566, at *13 (S.D. Ala. Nov. 13, 2013).  "In short, there is no mosaic here that suggests a long-running scheme to punish [Phillips] for having opposed sexual harassment in [her] workplace."  <u>Tate v. Ancell</u>, 551 F. App'x 877, 888 (7th Cir. 2014) (unpublished).  Accordingly, it is **RECOMMENDED** that defendants' summary judgment motion be **GRANTED** as to Phillips' Title VII retaliation claim against the City.

## C.    <u>State Law Claim</u>

Phillips has brought a state law claim for intentional infliction of emotional distress against defendants Grant, Johnson, and Norton.  <u>See</u> [Doc. 16 ¶¶ 39-42].[41] Defendants argue that this claim is barred by the applicable statute of limitations, and that it fails as a matter of law.  [Doc. 117 at 19- 22].  In response, Phillips asserts that "[t]his action undeniably involves intentional actions of [her] co-workers and supervisors in the Validations and Central Records Unit," and she then points to various actions allegedly taken by individuals other than the named individual

---

[41] Since it is recommended that the federal claims be dismissed, the Court could decline to exercise supplemental jurisdiction over the remaining state law claim and dismiss it without prejudice.  <u>See</u> <u>Carnegie-Mellon Univ. v. Cohill</u>, 484 U.S. 343, 350 (1988); <u>Scarfo v. Ginsberg</u>, 175 F.3d 957, 962 (11th Cir. 1999).

defendants.  See [Doc. 135 at 31-34].  In fact, Phillips does not even mention any actions allegedly taken by defendants Grant and Norton, see [id.],[42] and the only actions she complains of that were allegedly committed by Johnson are that in 2010, he made a threatening gesture towards her by clenching his fists while getting "up out of his seat . . . and mak[ing] steps towards [her] to lunge," [Doc. 130 at 185 p. 184, 199-200 pp. 198-99 (internal marks omitted); Doc. 117-13 at 41]; see also [Doc. 135 at 31], and that in 2011, he warned Officer Robinson to stay away from her or "she's going to file sexual harassment charges on you.  You're going to find yourself in trouble," [Doc. 118 at 9 p. 8, 32 p. 31, 41 p. 40]; see also [Doc. 135 at 33].  The Court, however, agrees with defendants that these allegations of conduct are barred by the statute of limitations.[43]

―――――――――――

[42] Indeed, Phillips even admits that none of the allegations asserted in her second amended complaint against Norton occurred after 2004, and that she only spoke to Grant up to 2006 or 2007, with their last communication being cordial. See [Doc. 130-1 at 59-62 pp. 268-71, 65-66 pp. 274-75, 91 p. 300].

[43] The Court notes that Phillips failed to even address defendants' argument that her state law claim is time-barred, see [Doc. 135 at 31-34], and defendants' motion with respect to this claim could therefore be granted as unopposed on this basis alone.  See Kramer v. Gwinnett Cty., 306 F. Supp. 2d 1219, 1221 (N.D. Ga. 2004), aff'd, 116 F. App'x 253 (11th Cir. 2004) (unpublished) (citation omitted) ("[A] party's failure to respond to any portion or claim in a motion indicates such portion, claim or defense is unopposed."); Welch v. Delta Air Lines, Inc., 978 F. Supp. 1133, 1148 (N.D. Ga. 1997), adopted at 1138 (footnote omitted) ("[U]nder Local Court Rule 7.1 of the United States District Court for the Northern District of Georgia, factual and legal claims to which there is no response should be treated as unopposed."); LR 7.1B, NDGa.; see also Guzman v. City of Hialeah, Case No. 15-23985-CIV-

"In Georgia, an action for injury to the person must be brought within two years after the right of action accrues." Smith v. Tandy Corp., 738 F. Supp. 521, 522 (S.D. Ga. 1990) (citing O.C.G.A. § 9-3-33). "The two-year statute of limitations includes actions for intentional infliction of emotional distress." Id. (citation omitted); see also Flowers v. Fulton Cty. Sch. Sys., No. 15-12220, 2016 WL 3159370, at *3 (11th Cir. June 7, 2016) (per curiam) (unpublished) (citations omitted). Phillips filed her initial complaint on March 7, 2014, see [Doc. 1]; however, "[b]ecause [Phillips] did not file the present complaint until more than two years [after the conduct allegedly committed by the named defendants occurred], [her] claims for intentional infliction of emotional distress are time-barred," Smith v. Mercer, Civil Action No. 1:13–CV–0768–RWS, 2013 WL 5350900, at *4 (N.D. Ga. Sept. 20, 2013), adopted at *1, aff'd, 580 F. App'x 871 (11th Cir. 2014) (per curiam) (unpublished).

Even were Phillips' intentional infliction of emotional distress claim not barred by the statute of limitations, her claim would still fail as a matter of law. To prevail on a claim of intentional infliction of emotional distress under Georgia law, Phillips must show that (1) the conduct was extreme and outrageous; (2) the

---

GAYLES, 2016 WL 3763055, at *2-3 (S.D. Fla. July 14, 2016) (granting defendant's motion to dismiss where plaintiff responded but failed to refute or address any of defendant's arguments); Hayes v. Rockdale Cty., 1:14-cv-2764-WSD, 2016 WL 154110, at *2 (N.D. Ga. Jan. 11, 2016) (citations omitted) (deeming defendants' motion for summary judgment on certain grounds unopposed as plaintiff failed to respond to those grounds).

defendants acted recklessly or intentionally; (3) the conduct caused emotional distress; and (4) the emotional distress was severe.  Trimble v. Circuit City Stores, Inc., 469 S.E.2d 776, 778 (Ga. Ct. App. 1996) (citation omitted); Bridges v. Winn-Dixie Atlanta, Inc., 335 S.E.2d 445, 447-48 (Ga. Ct. App. 1985) (citation omitted); see also Soloski v. Adams, 600 F. Supp. 2d 1276, 1371 (N.D. Ga. 2009), adopted in part at 1322 (citation omitted).  "The burden that a plaintiff must meet in order to prevail on this claim is a stringent one."  Soloski, 600 F. Supp. 2d at 1371 (citation omitted).

To be actionable, a defendant's conduct must be "so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society."  Kaiser v. Tara Ford, Inc., 546 S.E.2d 861, 868 (Ga. Ct. App. 2001) (citations and internal marks omitted).  "In the employment context, Georgia courts note that a major outrage in the . . . conduct complained of is essential to the tort of intentional infliction of emotional distress," Anderson v. Dunbar Armored, Inc., 678 F. Supp. 2d 1280, 1331 (N.D. Ga. 2009), adopted at 1290 (alteration in original) (citation and internal marks omitted), and "derogatory comments . . . generally do not meet the extreme and outrageous conduct element," MackMuhammad v. Cagle's Inc., 379 F. App'x 801, 806 (11th Cir. 2010) (per curiam) (unpublished) (citation and internal marks omitted).  Likewise, "[l]iability for intentional infliction of emotional distress does not extend to mere insults,

indignities, threats, annoyances, petty oppressions, or other trivialities." Harris v. Proctor & Gamble Cellulose Co., 73 F.3d 321, 323 (11th Cir. 1996) (citation and internal marks omitted).   "The conduct must be of such serious import as to naturally give rise to such intense feelings of humiliation, embarrassment, fright or extreme outrage as to cause severe emotional distress." MackMuhammad, 379 F. App'x at 806 (emphasis, citation, and internal marks omitted).   "However, '[t]he existence of a special relationship between the actor and victim, such as that of employer to employee, may make otherwise non-egregious conduct outrageous.'" Anderson, 678 F. Supp. 2d at 1331   (quoting Trimble, 469 S.E.2d at 778) (alteration in original).

The comments and incidents alleged by Phillips do not suffice to support a claim for intentional infliction of emotional distress under Georgia law. See Spence v. Panasonic Copier Co., 46 F. Supp. 2d 1340, 1350-51 (N.D. Ga. 1999), aff'd, 204 F.3d 1122 (11th Cir. 1999) (unpublished) (applying Georgia law and finding supervisor's conduct not extreme and outrageous where he screamed and insulted plaintiff); Fox v. Ravinia Club, Inc., 414 S.E.2d 243, 244-45 (Ga. Ct. App. 1991) (internal marks omitted) (finding no outrageous conduct where plaintiff's supervisor spoke to her in a "hostile, intimidating and abusive manner" and gave false reasons for her termination). "While [the alleged] conduct may have been offensive and upsetting

to [Phillips] . . . the Court cannot find that the conduct was so outrageous that it could support a finding that [defendants are] liable to [her] for a claim of intentional infliction of emotional distress." <u>Kimsey v. Akstein</u>, 408 F. Supp. 2d 1281, 1307-08 (N.D. Ga. 2005), adopted at 1283.

Phillips has also failed to prove that the alleged conduct in this case was so extreme and outrageous "as to go beyond all possible bounds of decency." <u>Kaiser</u>, 546 S.E.2d at 868 (citations and internal marks omitted). A reasonable jury could not conclude that the alleged harassment and comments alleged by Phillips constitute extreme and outrageous conduct required to support a claim of intentional infliction of emotional distress. <u>See</u> <u>Baynes v. Phillips Med. Sys., (Cleveland), Inc.</u>, Civil Action File No. 1:08-CV-2027-TWT, 2009 WL 3158180, at *2, 4 (N.D. Ga. Sept. 25, 2009), <u>aff'd</u>, 410 F. App'x 291 (11th Cir. 2011) (per curiam) (unpublished); <u>Frazier v. Smith</u>, 12 F. Supp. 2d 1362, 1375-76 (S.D. Ga. 1998); <u>Bowers v. Estep</u>, 420 S.E.2d 336, 338 (Ga. Ct. App. 1992); <u>Sossenko v. Michelin Tire Corp.</u>, 324 S.E.2d 593, 594 (Ga. Ct. App. 1984). Accordingly, it is **RECOMMENDED** that summary judgment be **GRANTED** as to Phillips' intentional infliction of emotional distress claim asserted against the individual defendants.

## IV.  CONCLUSION

For all of the foregoing reasons, it is **RECOMMENDED** that defendants'

motion for summary judgment, [Doc. 117], be **GRANTED**.

The Clerk is **DIRECTED** to terminate this reference.

**IT IS SO RECOMMENDED** and **DIRECTED**, this 29th day of July, 2016.


RUSSELL G. VINEYARD
UNITED STATES MAGISTRATE JUDGE